## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **BENJAMIN W. PAYNE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:16-CV-0945-VEH** |
| | ) | |
| **GOODYEAR TIRE AND RUBBER** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

## I.   INTRODUCTION

### A.   Summary of Mr. Payne's Claims

On June 7, 2016, Plaintiff Benjamin W. Payne ("Mr. Payne"), who is representing himself, initiated this job discrimination lawsuit against Defendant Goodyear Tire and Rubber Company ("Goodyear"). (Doc. 1). Mr. Payne filed an amended complaint (doc. 6) on June 29, 2016. On November 10, 2016, Mr. Payne filed a counseled Second Amended Complaint. (Doc. 24-1).[1] As amended, the lawsuit asserts violations of Title VII and 42 U.S.C. § 1981. (*Id.*).[2] Mr. Payne asserts two

---

[1] On February 24, 2017, Mr. Payne again began to represent himself. *See* docs. 35-38.

[2] All page references to Doc. 24-1 correspond with the Court's CM/ECF numbering system.

wrongful discharge claims against Goodyear–one on the basis of race and the other on the basis of disability.

### B.    Summary of Pending Motions

Pending before the Court are cross-motions for summary judgment. Mr. Payne's Motion for Summary Judgment (doc. 60) (the "Payne Motion") was filed on August 28, 2017. Goodyear's Motion for Summary Judgment (doc. 61) the "Goodyear Motion") was filed on August 29, 2017. On September 20, 2017, the Court entered its customary *pro se* summary judgment notice and scheduling order (doc. 67) that gave Mr. Payne special notice of his right to respond to the Goodyear Motion with affidavits or other opposing evidence and warned him about the consequences of not adequately responding to it. Both Motions have now been fully responded to and are ripe for submission.

For the reasons stated below, the Payne Motion is due to be denied and the Goodyear Motion is due to be granted.

## II.    LEGAL STANDARDS

### A.    Summary Judgment Generally

The Court may grant summary judgment only if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). A factual issue is genuine if there is sufficient

evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id*. The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id*. at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id*. at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir.2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id*. The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir.1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id*. at 1555–56.

## B.  Employment Discrimination

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) ("Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981))); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984) ("A Title VII disparate treatment plaintiff must prove that the defendant acted with discriminatory purpose." (citing *Clark v. Huntsville City Board of Education*, 717 F.2d 525, 529 (11th Cir. 1983))).

Although the Supreme Court has established the basic allocation of burdens and order of proof in a disparate treatment case, *see, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Burdine*, *supra*; *Desert Palace v. Costa*, 539 U.S. 90, 99-100 (2003), that framework applies only in cases in which there is no direct evidence of discrimination. *See Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987) ("The *McDonnell Douglas-Burdine* patterns of proof were designed to ease the evidentiary burdens on employment discrimin[a]tion plaintiffs, who rarely are fortunate enough to have access to direct evidence of intentional discrimination." (citing *Thornbrough v. Columbus and Greenville R.R.*, 760 F.2d 633, 638 (5th Cir. 1985), *abrogated on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993))).[3]

---

[3] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, [race, or some other unlawful reason], . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## C.     *Pro Se* Filings

"*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (citing *Fernandez v. United States*, 941 F.2d 1488, 1491 (11th Cir. 1991)). Accordingly, Mr. Payne's allegations arising out of her

---

1989) (citing *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 610-11 (11th Cir. 1987)). A liberal reading of Mr. Payne's filings in no way suggests that he has properly presented a direct evidence case of discrimination. Therefore, Mr. Payne necessarily relies upon the circumstantial-evidence model to support his claims.

former employment with Goodyear are not appropriately subject to dismissal simply because they lack procedural precision or completeness in the context of Rule 8 of the Federal Rules of Civil Procedure.

At the same time "if a [*pro se*] plaintiff pleads merely conclusory allegations [about his claims] and the defendant comes forward with affidavits setting out specific facts showing [why he cannot prevail on those claims], plaintiff cannot defeat summary judgment or dismissal for failure to state a claim by merely filing an affidavit that restates the conclusory statements asserted in the complaint." *Perry v. Thompson*, 786 F.2d 1093, 1094 (11th Cir. 1986). Similarly, "[i]f material undisputed facts show no cause of action or that summary judgment should be granted as a matter of law, the case can be disposed of[,] [and] [a] plaintiff may not frustrate this process by merely restating legal conclusions that he has alleged." *Id.* at 1094-95. However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint or affidavit must be considered in opposition to summary judgment.[4] *Id.* at 1095.

## III.   FACTUAL BACKGROUND[5,6]

---

[4]  It is not clear to the Court that Doc. 1-1 was submitted by Mr. Payne under penalty of perjury but, for purposes of this analysis, has assumed that it was. Otherwise, Mr. Payne has not submitted any sworn or verified statements.

[5]  Keeping in mind that when deciding a motion for summary judgment the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary

**Goodyear's tire manufacturing plant in Gadsden, Alabama.**

During the plaintiff's employment at Goodyear, the Human Resources Specialist for the Component Prep Business Center at the Gadsden plant was Michael Tucker. (Tucker Dec. ¶ 3). The Labor Relations Manager was Christopher Payne. (Christopher Payne Dec. ¶ 3).[7]

New hires undergo a probationary period of employment before they are hired on as regular fulltime employees. (Tucker Dec. ¶5). The probationary period is 320 hours. (Mobley Dec. ¶ 6).

New hires are evaluated on their performance by plant management during their probationary period of employment. (Tucker Dec. ¶6). Probationary employees who receive "unacceptable" ratings on their evaluations are discharged. (*Id*.).

Goodyear has a Policy of Non-Discrimination in Employment, which prohibits

---

judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d at 1328. Instead, the Court has provided this statement simply to place the Court's legal analysis in the context of this particular case or controversy.

[6] Due to Mr. Payne's failure to comply with this Court's Order (*see* Appendix II to Uniform Initial Order) in his Motion or in responding to the Goodyear Motion, the Court treats all of the facts set out in the Goodyear Motion as undisputed. Further, any facts set out in the Payne Motion that were not adequately disputed in the required manner have been considered by the Court as undisputed. Any undisputed fact has been set out exactly as proffered.

[7] Tucker and Payne are Caucasian. (Dustin Mobley Dec. ¶ 33).

discrimination on the basis of race, color, religion, sex, age, sexual orientation, national origin, or disability. (*Id.*, at ¶8).

6. The plaintiff received a copy of Goodyear's Policy of Non-Discrimination in Employment, and received training on it when he was hired. (*Id.*, at ¶ 9; Tucker Dec. Ex. A - policy acknowledgment (D-0059)).

**The plaintiff's probationary employment at Goodyear**

8. The plaintiff was interviewed for a position at Goodyear's tire manufacturing plant in Gadsden, Alabama on or around May 6, 2015. (Mobley Dec. ¶ 4). Training Manager Dustin Mobley interviewed the plaintiff. (*Id.*).[8]

9. The plaintiff was medically cleared to work with no restrictions. (Plaintiff "Plf." Dep. p. 96 lns 4-7; Mobley Dec. ¶5; Tucker Dec. ¶ 12).

10. The plaintiff was hired on July 13, 2015 on a probationary basis. (Mobley Dec. ¶6). Mobley was involved in the decision to hire him. (*Id.* at ¶4).

11. The plaintiff was hired into the position of Relief Operator on the Z Calendar Machine in Component Prep (Department 5330). (Tucker Dec. ¶11).

12. The Relief Operator relieves the Z Calendar crew, which includes the Calendar Operator, Windup Operator, Let-Off Operator, Mill Operator, and trucker.

---

[8] Mobley is Caucasian. (Mobley Dec. ¶ 2).

(*Id*. at ¶13).

The Relief Operator must be trained on and know how to perform all the jobs on the Z Calendar Machine. (Tucker Dec. ¶14).

The Z Calendar Relief Operator position is covered by the collective bargaining agreement, which contains a 320 hour probationary period. (*Id*. at ¶ 15).

The plaintiff has Lupus; it does not interfere with his ability to perform the Relief Operator position on the Z Calendar machine. (Plf. Dep. 86 lns 22-23, p. 87 lns 1-17, p. 93 lns 12-22, p. 133 lns 2-11).

The plaintiff had kidney failure; he underwent a successful kidney 16.transplant in 2012. (Plf. Dep. 86 lns 22-23, p. 87 lns 1-17).

The plaintiff is physically able to work; his medical conditions do not interfere with or restrict his ability to perform the job of Relief Operator on the Z Calendar machine. (*Id.*).

When the plaintiff was hired, he attended new-hire orientation and training along with eight other new hires. (Mobley Dec. ¶7). Six out of the eight new hires in the plaintiff's training class were also African American. (*Id*. at ¶8)

Lateshia Collins, Lucille Wiley, and Britney Higgins were in the plaintiff's new hire training class. (*Id*. at ¶9). Collins, Wiley and Higgins are African American. (*Id*. at ¶10).

The plaintiff attended new hire orientation and training which began on July 13, 2015 and lasted for about a week. (*Id*. at ¶12). Mobley was in charge of the plaintiff's new hire orientation and training. (*Id*. at ¶11).

Employees at the plant must wear steel or composite toed safety shoes at all times at work. (*Id*. at ¶13). The plaintiff and the other new hires were given vouchers to purchase safety shoes on July 14, and were instructed to purchase the safety shoes prior to July 20, 2015. (*Id*.)

The plaintiff failed to acquire the safety shoes by the deadline. (*Id.* at 21.¶14).

The plaintiff was the only new employee who management was aware of who failed to purchase his safety shoes by the deadline and did not notify the training department in advance of his inability to purchase the safety shoes by the deadline. (*Id*., at ¶15).

The plaintiff was sent home to purchase his safety shoes; he purchased them on July 21, 2015. (Mobley Dec. ¶16; Payne Dec. ¶9).

He was not terminated for failing to purchase his safety shoes by the deadline. (Mobley Dec. ¶18).

The plaintiff claims he was not the only one who failed to have safety shoes by the deadline, but was the only one sent home. (Plf. Dep. p. 147 lns 17-22). He believes this was race discrimination. (Plf. Dep. p. 47 lns 10-11, p. 147 lns 17-22). He claims

Britney Higgins (who is African American) failed to have her safety shoes by the deadline, but she was not sent home. (*Id.*, at p. 147 lns 17-22).

Management did not know Higgins failed to purchase her safety 25.shoes by the deadline. (Mobley Dec. ¶17; Payne Dec. ¶10).

During a plant tour the plaintiff asked an excessive number of questions to employees in the lab about how the lab was run; the questions were irrelevant and distracting. (Plf. Dep. p. 48 lns 8-23, p. 49 lns 1-9; Payne Dec. ¶11).

The plaintiff testified that Chris Payne told him he was exhibiting bullying behavior in questioning the lab employees. (Plf. Dep. p. 48 lns 8-23, p. 49 lns 1-23, p. 50 lns 1-23). The plaintiff believes this is evidence that he was singled out because of his race. (*Id.*).

During the plaintiff's new hire training and orientation, he and the other new hires were required to take their lunch breaks at the plant. (Mobley Dec. ¶19). Leaving the plant for lunch breaks during new hire orientation and training was not allowed. (*Id.*).

The plaintiff, Lateshia Collins, Britney Higgins, and Lucille Wiley ordered pizza for lunch during new-hire training one day. (Lateshia Collins Dep. p. 7 lns 5-17, p. 28 lns 22-23, p. 29 lns 1-2). The plaintiff left the plant to pick up the pizza, which was delivered to the guard shack. (Plf. Dep. p. 45 lns 11-16; Collins Dep. p. 7 lns 5-17).

The plaintiff was the only employee who left the plant to pick up the pizza. (Plf. Dep. p. 45, lns 10-16; Collins Dep. p. 7 lns 5-17, p. 24 lns 13-18).

The plaintiff claims Tina Lett, an hourly employee who was working in the computer lab at the time, told him it was ok to pick up the pizza. (Plf. Dep. p. 45 lns 6-10; Lucille Wiley Dep. p. 9 lns 4-10; Collins Dep. 28 lns 7-21; Tucker Dec. ¶ 18). Lett did not have the authority to authorize the plaintiff to leave the plant during new hire training and orientation. (Tucker Dec. ¶18; Payne Dec. ¶12).

Chris Payne questioned the plaintiff about why he left the plant and where he went. (Plf. Dep. p. 45, lns 13-23, p. 46 lns 1-10; Payne Dec. ¶ 12).

Tina Lett told management that she did not tell the plaintiff it was ok to pick up pizza from the guard shack. (Collins Dep. p. 19, lns 16-23, p. 20 lns 1-6; p. 28 lns 3-19; Mobley Dec ¶ 22; Payne Dec. ¶12)

The plaintiff believes he was singled out because of his race because he was the only one management questioned for leaving the plant to pick up a pizza. (Plf. Dep. p.44 lns 18-23, p. 45 lns 1-23, p. 46 lns 1-10).

**The plaintiff's performance during on-the-job training**

After new hire orientation and training, The plaintiff and the other new hires in his training class were assigned to on-the-job training. (Mobley Dec. ¶25).

The plaintiff was the only new hire assigned to on-the-job training on the Z Calendar machine. (Mobley Dec. ¶26).

As a Relief Operator, the plaintiff was required to learn all of the jobs on the Z Calendar Machine. (*see* Tucker Dec. ¶14).

The plaintiff's direct supervisor was Area Manager Jason McWhorter. (McWhorter Dec.¶3). McWhorter observed the plaintiff's performance during on-the-job training. (*Id*. at ¶6).[9]

When a new employee is hired to work a Relief Operator position on the Z Calendar machine, the standard process is for the employee to rotate training on each position on the Z Calendar machine, starting with the Mill Operator position. (Michael Stancil Dep. p. 21 lns 11-23).

After the new employee trains on the Mill Operator position, he then learns how to perform the Windup Operator position. (*See Id*.). He then learns how to perform the Let-Off Operator job, after which he learns how to perform the Calendar Operator position. (*See Id*.)

The plaintiff began on-the-job training by learning how to perform the Mill

---

[9] McWhorter is Caucasian. (Tucker Dec. ¶23).

Operator position on the mill line. (Mobley Dec. ¶ 28).

While training on the Mill Operator job, two Mill Operators—Michael Howell (African American) and Allen Blackwell (Caucasian)—provided on-the-job training to the plaintiff. (Plf. Dep. p. 114 lns 16-23, p. 115 lns 1-23, p. 116 lns 1-19; *see also* Stancil Dep. p. 26 lns 9-10; McWhorter Dec. ¶ 24).

Based on McWhorter's observations of the plaintiff's performance, he determined that the plaintiff was not interested in learning how to properly perform the job. (McWhorter Dec. ¶ 8).

It is important for the Relief Operator to know how to fix problems that arise on the Z Calendar. (*Id*., at ¶ 9).

McWhorter observed that the plaintiff would sit in a chair when there were problems on the Z Calendar machine instead of actively participating in on-the-job training by assisting the crew in fixing the problem. (*Id.* at ¶9).

When new hires are assigned to work on the Z Calendar, down time on the machine is routinely used for additional on-the-job training. (*Id*., at ¶10).

McWhorter observed that the plaintiff would disappear when there was down time on the Z Calendar instead of participating in on-the-job training. (*Id*.)

On several occasions McWhorter saw the plaintiff in another department chatting and socializing with other employees instead of actively engaging in on-the-job training on the Z Calendar. (*Id*., at ¶ 12)

McWhorter also observed that the plaintiff had a negative attitude towards other crew members who were trying to train him. (*Id*., at ¶ 11)

The tire manufacturing plant is dangerous; as is the Relief Operator 46.position. (*Id*. at ¶ 13). Employees must wear the required personal protective equipment ("PPE") at all times when on the plant floor. (*Id*). The plaintiff was instructed on this requirement during new hire orientation. (*Id.*)

McWhorter observed multiple times when the plaintiff failed to wear the required company-issued PPE while on the plant floor; the plaintiff failed to keep track of his safety glasses and protective cut-resistant gloves, which the plaintiff was required to wear at all times on the floor. (*Id*. at ¶ 14). McWhorter discussed this with the plaintiff on more than one occasion and reminded him that he must wear the required PPE at all times on the plant floor. (*Id*.) Despite this instruction, the plaintiff continued to have issues complying with the PPE requirement. (*Id*.)

McWhorter observed that the plaintiff had trouble learning the job duties of the Relief Operator position. (*Id*., at ¶15). McWhorter talked to the plaintiff on several occasions about the issues he observed with his performance. (*Id*.) The plaintiff

responded that he would do better, however, McWhorter did not see any improvement in his performance. (*Id.*).

McWhorter asked the plaintiff if he needed extra help learning the job; the plaintiff responded that he did not. (*Id.*, at ¶ 16).

McWhorter observed that the plaintiff would try to hide in the creel room instead of actively participating in on-the-job training. (*Id.*, at ¶ 17). McWhorter found the plaintiff in the creel room on several occasions, and it appeared to him that the plaintiff was sleeping. (*Id.*).

Probationary employees are not supposed to take off of work during the probationary period of employment, unless it is necessary and cannot be avoided. (*Id.*, at ¶ 18). The plaintiff took off work for personal reasons during his probationary period of employment. (*Id.* at ¶ 19).

During the plaintiff's employment, the only employee on [the] plaintiff's shift who was certified as a Designated Labor Trainer on all positions on the Z Calendar Machine was Michael "Steve" Stancil. (Stancil Dep. p 20 lns 3-23, p. 21 lns 1-10). Stancil is certified in performing all the positions on the Z Calendar machine. (Mobley Dec. ¶ 29).

Stancil has worked for Goodyear for 41 years; he's worked on the Z 53.Calendar for 36 of those years. (Stancil Dep. p. 19 lns 14-23, p. 20 lns 1-2).

As a designated labor trainer, Stancil observed the plaintiff's performance during on-the-job training and provided feedback to McWhorter, Tucker and Mobley. (Tucker Dec. ¶ 19-22; McWhorter Dec. ¶ 23; Mobley Dec. ¶30).

During on-the-job training, Stancil observed that the plaintiff did not actively participate in learning the job. (Mobley Dec. ¶ 31-32; McWhorter Dec ¶ 24; Tucker Dec. ¶ 20). Instead, he removed himself from training by siting down and passively watching work being done rather than performing it himself. (*Id.*; *see also* Stancil Dep. p. 10 lns 13-20). Stancil observed that the plaintiff was "very reluctant to do hands-on work." (Stancil Dep. p. 14 lns 3-11).

Howell complained to Stancil that he was having a difficult time training the plaintiff on the Mill Operator job. (Stancil Dep., p. 23 lns 21-23, p. 24 lns 1-23, p. 25 ln 1). Howell wanted the plaintiff moved to another work area; he was tired of trying to train the plaintiff because he believed the plaintiff was not interested in learning the job. (*Id.* at p 23 lns 16-23, p. 24 lns 1-23, p. 25 ln 1, 20-23). As a result, the plaintiff was moved from the Mill Operator position to train on the Windup Operator position with Kenneth Miller, who is African American. (*Id.*).

Stancil informed McWhorter, Tucker, and Mobley about the plaintiff's performance during on-the-job training. (Stancil Dep., p. 22, lns 8-23, p. 23, lns 1, p. 26 lns 11-20; Tucker Dec. ¶ 20-22; McWhorter Dec. ¶ 24; Mobley ¶ 30-32).

Stancil informed McWhorter, Tucker, and Mobley that they were having problems with the plaintiff wanting to sit in the chair all the time, not participating in on-the-job training, and not actively participating in the work on the Z Calendar machine. (Stancil Dep. p. 23, lns 5-15, p. 26, lns 11-23, p. 27 lns 1-6; Tucker Dec.¶ 20; McWhorter Dec. ¶ 24; Mobley Dec. ¶ 31).

The plaintiff would disappear from his work area and was gone for 20-25 minutes. (Stancil Dep. p. 28, lns 5-13; Tucker Dec. ¶ 20; McWhorter Dec. ¶ 26).

Stancil observed the plaintiff would wander to other departments and socialize with other employees instead of actively engaging in on-the-job training. (Stancil Dep. p. 28 lns 14-23, p. 29 lns 1-2).

Changing the wire on the Z Calendar is an important task, and one that requires the help of all employees on the Z Calendar. (McWhorter Dec. ¶ 25; Stancil Dep. p. 47 lns 18-20).

Changing the wire takes approximately 30 minutes. (McWhorter Dec. ¶ 25). It was important for the plaintiff to learn how to perform a wire change. (*Id*.)

The plaintiff disappeared during the wire-change on multiple occasions and did not return until after the change was complete. (Stancil Dep. p. 29 lns 3-23, p. 30 lns 1-23, p. 31 lns 1-21; Tucker Dec. ¶21; Mobley ¶32; McWhorter Dec. ¶26).

The plaintiff did not return to help with the wire change; instead Stancil found

the plaintiff sitting in a chair at the Windup area playing on his cell phone. (Stancil Dep. p. 29 lns 18-23, p. 30, lns 1-19). Stancil reported this to McWhorter, Tucker, and Mobley. (Stancil Dep. p. 30 lns 1-19; McWhorter Dec ¶26; Tucker Dec. ¶22; Mobley ¶32).

The length of training to become certified in performing all the positions on the Z Calendar machine is separate and distinct from the 320 hour probationary period of employment. (Stancil Dep. p. 33-35).

Becoming certified as a Relief Operator takes approximately 26 weeks. (Mobley Dec. ¶27).

**The plaintiff's termination**

McWhorter and Tucker each filled out a probationary evaluation form for the plaintiff. (Tucker Dec. ¶ 23; McWhorter Dec. ¶ 31, 32).

It is not uncommon for more than one probationary evaluation form to [be] completed for a new hire; sometimes only one is completed. (Tucker Dec. ¶7).

The plaintiff received three "unacceptable" and two "marginal" ratings in his probationary evaluation completed by McWhorter. (McWhorter Dec. ¶31). McWhorter recommended that the plaintiff's employment be terminated. (*Id.*)

The plaintiff received five "unacceptable" ratings in his probationary evaluation completed by Tucker. (Tucker Dec. ¶25). Tucker recommended that the plaintiff's

employment be terminated. (*Id.*).

McWhorter, Tucker, Mobley and Payne discussed the plaintiff's performance, and agreed he should be terminated. (Tucker Dec. ¶27; Payne Dec.¶14; Mobley Dec.¶ 33; McWhorter Dec. ¶30).

The plaintiff was terminated on August 31, 2015 due to the performance issues he displayed during his brief period of employment, which led Goodyear management to conclude that he was not committed to learning his job and performing even to minimally acceptable work standards. (Tucker Dec. ¶27, 29; Mobley Dec. ¶ 33, 34).

The plaintiff was the only probationary employee out of his training class who did not complete the probationary period of employment. (Tucker Dec. ¶30).

Steve Stancil did not make the decision to terminate the plaintiff. (Tucker Dec. ¶28).

The plaintiff was replaced by Derrell Simmons; Simmons is African American. (Tucker Dec. ¶ 41; Mobley Dec. ¶35).

Goodyear has discharged other probationary employees for receiving unacceptable ratings in their probationary evaluations based on performance issues. (Tucker Dec. ¶31).

Janice Allen, Caucasian, received two "unacceptable" ratings in her probationary evaluation and was discharged for performance issues on November 21, 2014. (*See*

Tucker Dec. ¶32). Allen did not have any known disabilities. (*Id*.)

Russell McDaniel, Caucasian, received four "unacceptable" ratings in his probationary evaluation and was discharged for performance issues on May 15, 2015. (*See* Tucker Dec.¶33). McDaniel did not have any known disabilities. (*Id*.)

Michael Tucker did not know about the plaintiff's medical conditions when the decision was made to discharge the plaintiff. (Tucker Dec. ¶34).

Christopher Payne did not know about the plaintiff's medical conditions when the decision was made to discharge the plaintiff. (Payne Dec. ¶ 16).

Dustin Mobley did not know about the plaintiff's medical conditions when the decision was made to discharge the plaintiff. (Mobley Dec. ¶ 38).

Jason McWhorter did not know about the plaintiff's medical conditions when the decision was made to discharge the plaintiff. (McWhorter Dec. ¶ 35).

The plaintiff never complained of discrimination based on his race or medical conditions during his employment with Goodyear. (Tucker Dec.¶35, Payne Dec. ¶ 17, McWhorter Dec. ¶ 39, Mobley Dec. ¶ 39).

The plaintiff believes Steve Stancil discriminated against him based on his race. (Plf Dep. p. 69-77). He believes this because he disagrees with feedback Stancil gave management about the plaintiff's performance during on-the-job training. (*Id*). He also believes this because he says Stancil told him he didn't deserve the Z Calendar Relief

Operator job as a new-hire because it's a highly sought after job that long-time employees want. (*Id*).

The Relief Operator position the plaintiff was hired into was not posted for all current employees to bid on. (Mobley Dec. ¶24). When this occurs, it creates a level of animosity between current employees who wanted the position and the new hire who received the position. (Id). This animosity has nothing to do with race. (Id.)

The plaintiff believes Mike Tucker discriminated against him based on his race. (Plf. Dep. p. 55-59). He believes this because he says Tucker made him take off a pair of safety glasses because they were not company-issued, and because Tucker informed him of his termination. (Plf. Dep. p. 55, lns 19-23, p. 56 lns 1-23, p. 57 lns 1-23, p. 58 lns 1-23, p. 59 lns 1-18).

The plaintiff believes Scott New treated him unfairly based on his race. (Plf. Dep. p. 59, lns 19-23, p. 60 lns 1-14). He believes this because he claims New "snatched a chair out from under" him on two occasions, and because he claims New called him "boy" on two occasions. (Plf. Dep. p. 67 lns 10-23, p. 68 lns 1-23, p. 69 lns 1-12).

Scott New is an hourly employee who works on the Z Calendar. (Tucker Dec. ¶36-37). He holds the position of Relief Operator on the day shift. (Plf. Dep. p. 60 lns 4-5).

Scott New was not involved in evaluating the plaintiff's performance during on-the-job training. (Tucker Dec. ¶37).

Scott New was not involved in the decision to terminate the plaintiff. (Tucker Dec. ¶38).

The plaintiff did not complain to anyone in management about any issues with Scott New. (Plf. Dep. p. 123 lns 1-5; Mobley Dec. ¶42; McWhorter Dec. ¶36; Tucker Dec. ¶ 36; Payne Dec. ¶18).

The plaintiff did not complain to anyone in management at Goodyear about New allegedly calling him "boy." (Plf. Dep. p. 123, lns 1-5; Tucker Dec.¶36; Mobley Dec. ¶43; McWhorter Dec.¶ 37; Payne Dec. ¶19).

The plaintiff believes Area Manager Jason McWhorter treated him unfairly based on his race. (Plf. Dep. p. 77- 82). The plaintiff believes this because on one occasion the plaintiff did not correctly swipe his time card and, as a result, he was not clocked in for the day; and the plaintiff told McWhorter about it. (*Id*. p.78). The plaintiff was accurately paid for the missing day, but he believes it took longer than he thinks it should have for him to be paid. (*Id*.).

The plaintiff also believes McWhorter discriminated against him based on his race because he claims McWhorter told him he did not need to call the gate house to report his absence on one occasion, but then the plaintiff was reported as a

no-call/no-show. (*Id*. p. 78 lns 22-23, p. 79 lns 1-23, p. 80 lns 1-23, p. 81 lns 1-23, p. 82 lns 1-9).

The plaintiff does not know whether McWhorter simply forgot to inform the gate house of the plaintiff's absence. (*Id*., p. 80, lns 22-23, p. 81 lns 1-3).

The plaintiff testified he thinks his medical conditions may have had 93.something to do with his termination. (Plf. Dep. p. 102 lns 5-9).

The plaintiff believes Mike Tucker and Steve Stancil discriminated against him based on his medical conditions. (Plf. Dep. p. 103 lns 22-23, p. 104 lns 1-5).

The plaintiff admits that he does not know whether Tucker was even aware of his medical conditions during his employment. (Plf. Dep. p. 107 lns 19-23, p. 108 lns 1-23, p. 109 lns 1-6).

The plaintiff admits that he does not know of any other probationary employee who received unacceptable ratings on their probationary evaluation who was not terminated. (Plf. Dep. p. 82, lns 16-23, p. 83 lns 1-4).

No one at Goodyear told the plaintiff he was terminated because of his race. (Plf. Dep. p. 83, lns 5-7).

## IV.   ANALYSIS

The Court now turns to an analysis of Mr. Payne's race discrimination and disability discrimination claims.

### A.    Summary Judgment in Favor of Goodyear Is Appropriate on Mr. Payne's Race Discrimination Claim.

Goodyear challenges Mr. Payne's ability to support a *prima facie* case of discriminatory discharge due to race. (Doc. 62 at 23).

Initially, the Court notes that there is no direct evidence of race discrimination here. While evidence of a <u>decisionmaker's</u> racial bias (depending upon its adequacy) can support a *prima facie* case of race discrimination, here the offensive comment Mr. Payne relies on was made by a non-supervisory co-employee who had no role in Mr. Payne's termination. Specifically, the Court is aware that Mr. Payne has testified under oath that Scott New called him "boy" on two occasions, since it is uncontroverted that Mr. Payne never complained to anyone in management about that statement, and uncontroverted that Mr. New was not involved in the decision to terminate Mr. Payne, this racially-charged statement is simply insufficient to constitute direct evidence of discrimination. *See Standard v. A. B. E. L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) (finding that "speculation of a non-decisionmaker ... is circumstantial evidence at best.").

Where, as here, there is no direct evidence of discrimination, the burden is on the plaintiff to "create an inference of discrimination by establishing a prima facie case." *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002). Thus, a

plaintiff suing for wrongful discharge arising under Title VII or § 1981[10] has the burden

to show that: "(1) [he] is a member of a protected class; (2) [he] was subjected to [an]

adverse employment action; (3) [his] employer treated similarly situated ... employees

[of a different race] more favorably; and (4) [he] was qualified to perform the job.

*McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (quoting *EEOC v. Joe's

Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir.2000) (alterations supplied). Only if

a plaintiff establishes a prima facie case, the defendant "must provide a legitimate,

nondiscriminatory reason for their action. If this burden is met [by the defendant], [the

plaintiff] must then prove that the [defendant's] reasons are a pretext for unlawful

discrimination. *Id*. (alterations supplied) (internal citation omitted).

Both the third and the fourth elements are at issue here. Specifically, Goodyear

contends that "[a]s an initial matter, the plaintiff's performance issues during his brief

employment demonstrated that he was not qualified to do the job." (Doc. 62 at 23).

Goodyear further argues (doc. 62 at 25) that, because Mr. Payne was replaced with

someone who was in the same racially-protected category (African American), he

---

[10] The Court evaluates Mr. Payne's comparable § 1981 claims under the Title VII framework. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.14 (11th Cir. 2011) ("Title VII and § 1981 have the same requirements of proof and utilize the same analytical framework." (citing *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991)); *see also Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) ("[T]he analysis of disparate treatment claims under [§ 1981 by and through] § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same.").

cannot meet the fourth element.

However, even though Mr. Payne was replaced with someone who was in the same racially-protected category as Mr. Payne, he may still be able to establish a *prima-facie* racially- discriminatory discharge claim. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir. 1989) ("There are a number of ways of establishing a *prima facie* case pursuant to *McDonnell-Douglas*."). For example, he can also make out a *prima facie* case by "show[ing] that he is a member of a protected class, that he was qualified for the job from which he was fired, and 'that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'" *Nix*, 738 F.2d at 1185 (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982)). Under this construct, "[t]he *prima facie* case is established even if the plaintiff's replacement is also a member of the protected class." *Nix*, 738 F.2d at 1185.

That is, even though Mr. Payne's replacement was also African American, Mr. Payne can create an inference of discrimination by showing that "he did not violate the work rule[.]" *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). *See also Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980) ("With respect to discharge for violation of work rules, the plaintiff must first demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did,

28

white employees who engaged in similar acts were not punished similarly.").[11] A plaintiff may also utilize these two additional *prima-facie* models when complaining about disparate treatment in discipline that falls short of discharge. *See Gerwens*, 874 F.2d at 1540 (describing holding as applicable to "cases involving alleged racial bias in the application of discipline for violation of work rules").

However even viewing the evidence in the light most favorable to Mr. Payne, no reasonable jury could finds that it satisfies either one of these alternative models. As an initial matter, Mr. Payne's allegation that he endured discriminatory discipline presents no triable claim, as he has failed to show that any non-African American employees who engaged in similar acts that management knew about who were not disciplined like Mr. Payne.

Further, not all discipline qualifies as an adverse employment action. *See, e.g., Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (holding that "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment") (emphasis in original), *overruled on other grounds as recognized by Crawford*, 529 F.3d at 974; *Davis*, 245 F.3d at 1240 (concluding that

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

neither "negative job performance memoranda placed in [a] file" nor "changes in . . . work assignments" without "any economic injury" are sufficiently adverse to trigger Title VII protection against discrimination). Thus, Mr. Payne must have experienced discipline that rises to the level of a tangible job detriment to pass *prima-facie* muster when claiming discriminatory treatment. *See id.* at 1239 ("Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a <u>tangible adverse effect on the plaintiff's employment</u>.") (emphasis added).

None of the discipline of which Mr. Payne complains had the required tangible adverse effect. For example, the fact that he was questioned by management about leaving the work area to receive a pizza for lunch had no tangible adverse effect.[12] Similarly, his being sent home to obtain safety equipment, with no reduction in pay, had no tangible adverse effect.

Mr. Payne's discharge, on the other hand, is undoubtedly an adverse employment action within the meaning of Title VII discrimination. Nonetheless, Mr. Payne's *prima facie* case of racially-discriminatory discharge fails on the merits.

In particular, Mr. Payne has not provided <u>evidence</u> of a <u>specific</u> white probationary employee who was accused of nearly identical poor performance, but who

---

[12] And there is no evidence that a white employee similarly left the work area.

(in contrast to Mr. Payne) was not fired for that comparably poor performance.

Mr. Payne also has not adduced evidence from which a reasonable jury could conclude that his performance was not in fact "poor." Importantly, Mr. Payne's unsubstantiated and subjective belief (no matter how strong) that his performance was acceptable simply not enough to establish a *prima facie* case of race discrimination. *Cf., e.g., Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) ("While Holifield has testified that he felt discriminated against, his opinion, without more, is not enough to establish a *prima facie* case of race discrimination.") (emphasis added).

Given Goodyear's compelling undisputed evidence of Mr. Payne's unsatisfactory performance during his probationary employment, the lack of any direct evidence of discriminatory intent, and the failure of Mr. Payne to point to any Goodyear probationary employee outside of his protected category who had unsatisfactory performance ratings but was not terminated,[13] the Court finds that Mr. Payne has failed to adduce evidence to establish a prima facie case of race discrimination.

Accordingly, the Goodyear Motion is due to be granted[14] as to Mr. Payne's race discrimination claim because he has failed to establish a *prima facie* case. *Cf.*

---

[13] Indeed, it is undisputed that Mr. Payne had five "unacceptable" ratings on his probationary evaluations at the time he was fired. It is further undisputed that two white probationary employees, Janice Allen and Russell McDaniel, had fewer unacceptable ratings than Mr. Payne and were also fired.

[14] Concomitantly, the Payne Motion is due to be denied as to such claim for the same reasons.

*Burke-Fowler v. Orange County*, 447 F.3d 1319, 1325 (11th Cir. 2006) ("Because she failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination, Burke-Fowler did not establish a *prima facie* case of race discrimination." (citing *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d at 1286).

In the absence of a prima facie claim of race discrimination, the Court declines to consider Goodyear's other summary judgment arguments on such claims.

### B. Summary Judgment in Favor of Goodyear Is Appropriate on Mr. Payne's Claim under the ADA.

Goodyear similarly challenges Mr. Payne's ability to support a *prima facie* case of discriminatory discharge due to disability. (Doc. 62 at 27).

The Americans with Disabilities Act (the "ADA") provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The familiar *McDonnell Douglas* circumstantial evidence framework applies to ADA discrimination cases. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (*see also generally McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817). The Eleventh Circuit has noted that

[u]nder this burden-shifting analysis, [the plaintiff has] the initial burden of establishing a prima facie case of disability discrimination. *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir.2001). To establish a prima facie case of ADA discrimination, [the plaintiff has] to show (1) a disability, (2) that [he] was otherwise qualified to perform the job, and (3) that [he] was discriminated against based upon the disability. *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir.2002); *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 910 (11th Cir.1996). *** [A] prima facie case ... establishes a presumption of discrimination....

*Cleveland*, 369 F.3d at 1193; *see also Ward v. United Parcel Serv.*, 580 Fed.Appx. 735, 740 (11th Cir. 2014) ("To establish a prima facie case, a plaintiff may show that (1) he was disabled, (2) he was qualified to perform the job, and (3) he was subjected to an adverse employment action because of his disability.").

The statute protects only "qualified individual[s]" with a disability. 42 U.S.C. § 12112(a). Goodyear correctly points out (doc. 62 at 28) that Mr. Payne has failed to show that he has a disability.

The definition of disability under the ADA is "(A) a physical or mental impairment which substantially limits one or more of an individual's major life activities; (B) a record of such impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(2); see also 29 C.F.R. § 1630.2(g). A plaintiff must satisfy at least one of these three alternative definitions.

Mr. Payne's claimed disabilities are that he had a kidney transplant in 2012 and that he suffers from Lupus. However, other than stating his medical history, Mr. Payne

has wholly failed to explain, much less show, how that medical history "substantially limits" any of his "major life activities." Further, the uncontroverted evidence is that none of the Goodyear decision-makers knew of Mr. Payne's medical history. Accordingly, he has also failed to show that he was "perceived as" disabled, or that his termination had anything to do with his medical conditions. These failures cause Mr. Payne's prima facie case to fail.

Additionally, the extensive and uncontested evidence of Mr. Payne's poor performance together with the absence of any comparators without a disability who had similarly poor performances and who were treated better than Mr. Payne, as outlined in the previous section of this Memorandum Opinion, is an additional basis for this Court's determination that Mr. Payne has not established a prima facie case to support this claim.

The Goodyear Motion is also due to be granted as to Mr. Payne's disability-based claim.[15] Further, in the absence of a prima facie claim of discrimination based on disability (actual or perceived), the Court declines to consider Goodyear's other summary judgment arguments on such claims.

## IV. CONCLUSION

Because Mr. Payne has failed to establish a prima facie case of employment

---

[15] Concomitantly, the Payne Motion is due to be denied as to this claim.

discrimination based on race or based on disability, the Payne Motion is due to be denied and the Goodyear Motion is due to be granted. Further, with no claims remaining for resolution, this action is due to be dismissed with prejudice.

A separate order will be entered.

**DONE** this the 27th day of March, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge
